Matter of R.A. (A.R.) (2025 NY Slip Op 04295)

Matter of R.A. (A.R.)

2025 NY Slip Op 04295

Decided on July 24, 2025

Appellate Division, First Department

Gesmer, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 24, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Tanya R. Kennedy
David Friedman Ellen Gesmer Saliann Scarpulla

Motion No. M-1247, M-1268, M-1483|NN-00057/24|Docket No. NN-00057/24|Appeal No. 4207|Case No. 2024-06363|

[*1]In the Matter of R.A., A Child Under Eighteen Years of Age, etc., A.R., Respondent-Respondent, Administration for Children's Services, Respondent-Respondent. K.K., Nonparty-Appellant. Sanctuary for Families, Day One, Empire Justice Center, Her Justice, Lawyers Committee Against Domestic Violence, Legal Momentum, New York Legal Assistance Group, New York State Coalition Against Domestic Violence, Brooklyn Defender Services, Family Defense Practice, Bronx Defenders, The Center for Family Representation and Americans for Prosperity Foundation, Amici Curiae.

Nonparty mother appeals from an order of Family Court, New York County (Yael T. Wilkofsky, J.), entered on or about October 9, 2024, which vacated an order of the same court (Anna R. Lewis, J.), entered on or about January 3, 2024, which placed nonrespondent mother K.K. under ACS supervision during the pendency of the neglect proceedings against respondent father A.R., on consent of ACS.

Family Justice Law Center, New York (David Shalleck-Klein and Lewis Bossing of counsel) and New York University School of Law Family Defense Clinic Washington Square Legal Services, New York (Christine Gottlieb of counsel), for appellant.
Muriel Goode-Trufant, Corporation Counsel, New York (D. Alan Rosinus, Jr. and Rebecca L. Visgaitis of counsel), for Administration for Children's Services, respondent.
Dawne A. Mitchell, The Legal Aid Society, New York (ZoË Allen of counsel), attorney for the child.
Lara Flath, James Bolton Smith, Taji Alessandra Hutchins and Tahsin Mehjabin Ahmed, New York, for Sanctuary for Families, Day One, Empire Justice Center, Her Justice, Lawyers Committee Against Domestic Violence, Legal Momentum, New York Legal Assistance Group, New York State Coalition Against Domestic Violence, amici curiae.
Brooklyn Defender Services, Family Defense Practice, Brooklyn (Amy Mulzer, Jessica Marcus and Lauren Shapiro of counsel), for Brooklyn Defender Services, Family Defense Practice, Bronx Defenders and Center for Family Representation, amici curiae.
Saul Ewing LLP, New York (Michael S. O'Reilly and John A. Basinger of counsel), for Americans for Prosperity Foundation, amicus curiae.

GESMER, J.
We hold it unlawful for Family Court to order that the Administration for Children's Services (ACS) supervise a nonrespondent parent [FN1] who was already caring for their child prior to the filing of the Family Court Act article 10 petition. We find that ACS's stated policy of monitoring the nonrespondent parent in such cases is not permitted under Family Court Act § 1017 or any other provision of the Family Court Act, including and especially where the reason ACS seeks supervision is that the nonrespondent parent is a domestic violence survivor.
By petition dated January 3, 2024, ACS alleged that respondent father neglected the child by committing acts of domestic violence against the nonrespondent mother in the child's presence. The petition specifically alleged that the mother told the father that she did not want to be in a relationship with him anymore, and the father grabbed the mother by the face, causing her to fall to the ground, hit her, stomped her, and strangled her until she briefly lost consciousness in front of their then 14-month-old child. A neighbor called 911, and when the responding officers knocked on the door of the apartment, the father grabbed a knife and threatened to kill the mother if she spoke to them. An ACS caseworker subsequently observed the mother to have scratches on her face from her temple to her right cheek and on [*2]the side and back of her neck, which the mother attributed to the incident.
On the date ACS filed the petition, Family Court held an initial conference. The nonrespondent mother initially did not appear, and the court began the conference without her. ACS requested a temporary "release" of the child to the mother pursuant to section 1017 of the Family Court Act, even though the child had never been removed from the mother's care. ACS also requested that the court issue an order of protection directing the father to stay away from the mother and child, subject to an order directing that the father have supervised visitation. No one expressed safety concerns about the mother or the condition of her home. Indeed, there was no dispute that she is "a good mother" and "very strong [and] hard-working." After ACS made its application to the court, counsel for ACS reached her by phone while she was at work, and she then joined the conference. The court did not assign counsel to represent the mother that day as no attorneys were available. The court then granted ACS's application in all respects.
There is no support in the record for ACS's claims that the mother "accept[ed] the Family Court's release of the child to her," "agreed to submit to the Family Court's jurisdiction," and did not "object" to supervision. Rather, the record reveals that none of these issues was discussed with the mother while she was present in Family Court. After the mother appeared, Family Court stated that it would issue "a temporary release . . . of the child to [the mother]. There [would] be an order of protection on behalf of [the mother] and the child against the father with carve-out visitation for agency-supervised as well as resource-supervised visits." The court did not mention jurisdiction over or supervision of the mother, and no one asked the mother for her consent as to any aspect of the order.
The court's written order provided that the child was released to the mother "under ACS supervision," although that had not been discussed on the record in the mother's presence. ACS acknowledged that it is the Agency's "standard procedure" to monitor the nonrespondent parent's care of a child through ACS supervision until Family Court issues a fact-finding order in a proceeding pursuant to article 10 of the Family Court Act.
In June 2024, after the mother was assigned counsel, she moved to vacate the January 3, 2024 order's provision for ACS supervision. In her affidavit, she stated that she and the child had been subjected to over 15 announced and unannounced home visits by an ACS caseworker in a six-month period. During those visits, the caseworker searched every room in the mother's home, inspected the contents of her refrigerator, and closely inspected the child's body.[FN2] The mother described the searches as "traumatizing," "intrusive and humiliating," said they reminded her "of the fear and anxiety of being abused" by the father, and "brought [her] back to a dark place [*3]where [she] was forced to think about the abuse" by the father. She further stated that ACS supervision had a substantial negative impact on her ability to have friends and family visit her and her child, to control her schedule, and "to live freely." In addition, she missed overtime opportunities at work in order for ACS to conduct home visits. The mother's description in her affidavit of multiple announced and unannounced caseworker visits and surveillance of the intimate aspects of the family's daily life [FN3] is consistent with statements in the amicus brief of Sanctuary for Families that actions taken by ACS during ACS supervision sometimes mimic the coercive control exercised by an abusive partner, including by regulating the nonrespondent's daily activities or intruding on the nonrespondent parent's autonomy in other ways. For example, ACS may require the nonrespondent parent to seek shelter or an order of protection when these are not safe options under the circumstances (Amicus Br. of Sanctuary for Families at 10-11 [citing The "Failure to Protect" Working Group, Charging Battered Mothers With "Failure to Protect": Still Blaming the Victim, 27 Fordham Urb. L.J. 849, 855 (2000)]). In addition, as the mother in this case experienced and as Sanctuary for Families point out, compliance with ACS supervision can become "a full-time job," and worsen economic harms typically caused by abuse (Amicus Br. of Sanctuary for Families at 12-13, citing Patricia Fersch, Why Doesn't the Severe Harm and Costs of Domestic Violence Result in More Women Going to Court?, Forbes [Dec. 13, 2023] [citing research finding that domestic violence causes survivors to lose 8 million days of work each year and results in loss of jobs for 21%-60% of survivors], available at: https://www.forbes.com/sites/patriciafersch/2023/12/13/why-doesnt-the-severe-harm-and-costs-of-domestic-violence-result-in-more-women-going-to-court/ [last accessed Apr. 15, 2025]). The resulting economic hardship disproportionately affects people of color, members of other historically marginalized communities and those of low-income. As addressed by Sanctuary for Families, they are "more likely to already be living in difficult economic situations, and more likely to face additional economic hardship as a result of their being abused" (Amicus Br. of Sanctuary for Families at 16, citing New York City Mayor's Office to End Domestic and Gender-Based Violence, Report on the Intersection of Domestic Violence, Race/Ethnicity and Sex [2020]). The mother argued that ACS supervision was not authorized by Family Court Act §§ 1017 or 1027 because an order of supervision may only be issued in the context of the child's physical removal from a home or a caregiver. She also argued that the supervision order violated her Fourth Amendment rights, as both her home and her child's body were subjected to repeated announced and unannounced searches and inspections by ACS during the supervision period, despite the agency [*4]having no reason to believe that the child was being neglected or that the conditions of the home were unsafe. Finally, she argued that the order violated her right to substantive due process because ACS was allowed to interfere with her parenting of the child in her home without any suspicion or allegation of harm, despite maintaining a position that the mother was a fit parent.
By order dated October 9, 2024, Family Court granted the mother's motion, based on ACS's offer to stop supervision of the mother's home and its consent to vacate the January 3, 2024 order, without addressing the mother's legal arguments. On the record, the court expressed its concern that, after the mother filed her motion and the court heard argument, and after "waiting for some time, ACS then decided to pivot and stop supervision over [the mother], for a reason that has not been made clear . . . . It could be interpreted as . . . 'we don't want a decision like that to be out there . . . or perhaps it was just that ACS didn't think that this particular parent needed to be supervised." The mother appealed. We now affirm, on different grounds.
Although the mother has already received her requested relief, her appeal—directed at Family Court's authority to order ACS supervision over a nonrespondent parent when the child has not been removed from that parent's home in Family Court Act article 10 cases—raises a significant and novel issue that is likely to reoccur, yet evade review, and warrants an application of the exception to the mootness doctrine (see generally Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714-715 [1980]; Matter of Malachi B. [Administration for Children's Servs.], 228 AD3d 570, 570-571 [1st Dept 2024]).
Indeed, although ACS is not the appellant in this appeal, in the conclusion to its brief, ACS asks this Court to affirm the January 3, 2024 "Release Order," which it had previously agreed to vacate. This request on appeal and change in ACS's position, along with ACS's admission that it is the Agency's "standard procedure" to monitor the nonrespondent parent's care of a child through ACS supervision until a determination of an article 10 proceeding, demonstrates that this situation is likely to reoccur. Even Family Court recognized that ACS might seek to impose supervision on the mother again in the future. In its October 9, 2024 order granting the mother's motion, it specified that "[i]f ACS seeks to supervise the [nonrespondent] mother in the future, ACS shall move, by Order to Show Cause, for such relief." Moreover, the mother and some of the Amici also argue that ACS changed its position in order to avoid substantive legal rulings on the issues raised in this case. Family Court also raised this as a "concerning" possibility in this case.
Furthermore, the mother challenges what ACS has conceded is its "standard procedure" of seeking to monitor nonrespondent parents through supervision until issuance of a fact finding order in an article 10 case. Nonrespondent [*5]parents in article 10 cases are entitled to legal representation, including assignment of counsel where they cannot afford to retain an attorney (Family Court Act § 262[a][iv], [b]). However, it is unlikely that an individual or group with standing to challenge ACS's policy would have the ability or means to do so outside of the context of the article 10 proceeding in which the policy is applied, since they would have no guaranteed right to counsel in such a case. This is particularly so given the fact that the hardships that can result from ACS supervision disproportionately affect lower-income and marginalized communities, including Black and Latino communities (see Matter of Sapphire W. [Kenneth L.], 237 AD3d 41, 51 [2d Dept 2025] [citing Written Testimony of David A. Hansell, NY City Council, Comm on Gen Welfare, Oct. 28, 2020, at 2-6, available at https://www.nyc.gov/assets/acs/pdf/testimony/2020/GWCommitteeHearing.pdf (last accessed Apr. 10, 2025)]; see also NYC Child Welfare Indicators Annual Report FY2023 at 17, available at https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/CityCouncilReportCY2023.pdf [last accessed Apr. 10, 2025] [finding that, out of 1,500 children removed on an emergency basis in 2023, 663 were identified as African American and 650 were identified as Hispanic]). Accordingly, we find that this issue is likely to reoccur, yet evade review.
"It is well established that Family Court is a court of limited jurisdiction, constrained to exercise only those powers granted to it by the State Constitution or by statute" (Matter of Lisa T. v King E. T., 30 NY3d 548, 551 [2017]). The issue of whether the temporary release and supervision provisions of Family Court Act § 1017 are triggered when the child remains in the home with the nonrespondent parent was recently addressed in the Second Department decision in Matter of Sapphire W. (237 AD3d 41; see also Matter of Danna T. [Miguel T.], 82 Misc 3d 723 [Family Court, Kings County 2024]). The facts in Matter of Sapphire W. are virtually indistinguishable from this case. In Sapphire W., ACS commenced a neglect proceeding against the respondent father for committing acts of domestic violence against the mother in the child's presence. Similar to the present case, the mother and child in Sapphire W. resided together, while the father did not live in the home (237 AD3d at 44). There were no concerns about the mother's fitness as a parent, the condition of her home, or her willingness to take appropriate steps should the father violate an order of protection against him (id.). Despite this, ACS requested, and Family Court ordered, that the child be released to the nonrespondent mother under ACS supervision (id.).
The Second Department reversed and vacated the order, finding that, based on the plain language of the statutory text, Family Court Act § 1017 does not apply in the absence of a court-ordered removal (id. at 48-49). The Court held that the provisions of Family Court Act § 1017[*6](3), which require the nonrespondent parent to submit to the court's jurisdiction and authorize the court to order ACS supervision over that parent, are not triggered when the child remains in the home with the nonrespondent parent, and the Family Court has no authority to impose supervision or its equivalent over that parent (id.).
The Court also held that the relevant provisions of Family Court Act § 1017 do not apply indirectly through Family Court Act § 1027(d) to permit the court to impose supervision on a nonrespondent parent in whose care the child remains, because Family Court Act § 1027(a) requires that a hearing be held to determine "whether the child's interests require protection" before Family Court may "release" a child to a nonrespondent parent. As was the case here, there was no hearing at which testimony and evidence were presented. Moreover, the Court held that, even if the brief conference held in that case, as here, could have been considered a hearing, both Family Court Act §§ 1017(2)(a)(ii) and 1027(d) only apply after a child has been removed. Since the child had never been removed from the nonrespondent parent's care, neither provision applied.
The Court further found that, to the extent that there was any ambiguity in the statutory language, legislative history also supports its holding. It stressed that Article 10 of the Family Court Act "'erects a careful bulwark against unwarranted state intervention into private family life, for which its drafters had a deep concern'" (id. at 50, quoting Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 284 [2017]; see also Matter of R.C., __ AD3d __, 2025 NY Slip Op 01859 at *4 [1st Dept 2025]), and that
"a child protective agency's involvement with a family may itself have a negative impact on the parent or the child, even if it may be necessary in some circumstances to prevent or repair the effects of abuse or neglect. An ACS investigation, by its nature, intrudes upon the private lives of the parent and child to one degree or another . . . and, at least on occasion, may be traumatic for both the child and the parent" (Sapphire W., 237 AD3d at 51 [internal citations omitted]; see also Matter of R.C., __ AD3d __, 2025 NY Slip Op 01859 at *3; Joseph Goldstein, Albert J. Solnit, Sonja Goldstein and Anna Freud, The Best Interests of the Child: The Least Detrimental Alternative, 97 [1996] [noting that children "react with anxiety even to temporary infringements of parental autonomy"]).
As noted by the Sapphire W. Court, "in 2015, the Legislature enacted sweeping legislation that amended various statutes, including Family Court Act § 1017, in order to provide nonrespondent parents with greater participation in abuse or neglect proceedings, while also expand[ing] the options available to Family Court judges when craft[ing] appropriate orders respecting the rights of non-respondent parents [and] assuring the safety and well being of children who are the subjects of the proceedings .[*7]. . . Among other things, the legislation clarifie[d] the language of Family Court Act § 1017 by referring specifically to non-respondent parent, relative or suitable person as potential resources a court may consider after determining that a child must be removed from his or her home" (Sapphire W., 237 AD3d at 51-52 [internal quotation marks and citations omitted; emphasis added]).
We agree with the sound reasoning in Matter of Sapphire W. and hold that Family Court Act §§ 1017 and 1027(d) do not permit supervision of a nonrespondent parent who has been caring for the child, in the absence of a court-ordered removal of the child. We further concur with the Second Department that, "[c]onsidering the intrusive and potentially traumatic impact of ACS involvement in a family's life, the disproportionate involvement of Black and Hispanic children in the child welfare system cannot be ignored" (Sapphire W., 237 AD3d at 51).[FN4] ACS argues that, if Family Court Act §§ 1017 and 1027(d) do not permit Family Court to impose ACS supervision of a nonrespondent parent's care of a child who has never been removed from that parent, then Family Court will not be able to make directives necessary for the protection of the child during the neglect or abuse proceeding against the respondent parent. We reject that claim for two reasons. First, in this case, the mother has never objected to cooperating with the child's visits with respondent father or with the child's attorney. Accordingly, as even ACS eventually conceded, there was no need for an order directing her to cooperate.
Second, in cases like the one at bar,
"all other statutory provisions that might apply generally would still apply . . . . Fundamentally, however, because [the nonrespondent parent] is not alleged to be unfit, and because the child has not been removed from a parent or her home, the only person responsible under the law for protecting [the child] is [the nonrespondent parent]. That [the respondent parent] is alleged to have harmed the child does not give the state carte blanche to make demands on [the nonrespondent parent]. The proper balance is reached by giving section 1017 its plain meaning, and leaving [the nonrespondent parent] as the primary protector of [the] child" (Matter of Danna T., 82 Misc 3d at 727-728).
As the child's attorney in this case notes, existing statutes require, among other things, that the court, at the beginning of every article 10 case, assign an attorney for the child (Family Court Act §§ 249, 1016), who can seek appropriate relief on the child's behalf throughout the proceeding. The court also has statutory authority to issue temporary orders of protection on behalf of the child (Family Court Act § 1029) and orders directing ACS to provide or arrange for the provision of services for the child and/or nonrespondent parent (Family Court Act § 1015-a) while an article 10 proceeding is pending.
ACS argues that, when the respondent parent has physically abused [*8]the nonrespondent parent, "it makes particular sense" to impose supervision, whether the child has been removed or not. ACS further argues that the abuser may not abide by the order of protection, and the nonrespondent parent "may face significant risks if they stand up to their abuser or seek outside assistance." However, this only 'makes sense' if ACS is permitted, as a matter of law, to presume that the nonrespondent parent will not take appropriate steps under the circumstances to keep herself and her child safe. In fact, ACS fails to demonstrate how surveilling and directing the nonrespondent parent in such cases would make that parent or the child any safer. Rather, as the mother and Sanctuary for Families note, ACS's policy of insisting on supervision in such cases "reinforces the coercive control underpinning abusive relationships," "turn[s] survivors into suspects," and requires the nonrespondent parent "to answer for [the respondent parent's] abusive behaviors" (Appellant's Reply Br. at 16; Amicus Br. for Sanctuary for Families at 6-11). As the court in Nicholson v Williams (203 F Supp 2d 153 [EDNY 2002]) observed over two decades ago,
"The battered mother . . . may easily be engaged and seen as the parent who is more willing and interested in complying with services to prevent removal of her children or to get them returned from foster care. . . . This unequal treatment sends a message that the mother is more responsible for getting help and is more 'sick' for being in an abusive relationship than the actual person who committed the violence" (id. at 211).
Essentially, the ACS policy at issue in this case permits it to surveil the mother simply because the child's father committed acts of domestic violence against her. We cannot condone a policy based on this faulty and unlawful premise (cf Nicholson v Scoppetta, 3 NY3d 357, 371-72 [2004]) . Because we affirm Family Court's order on statutory grounds, we do not reach the mother's constitutional arguments (see Matter of Syquia v Bd. of Educ. of Harpursville Cent. School Dist., 80 NY2d 531, 535 [1992] ["courts should not address constitutional issues when a decision can be reached on other grounds"]; see also Matter of People v Quality King Distribs., Inc., 209 AD3d 62, 74 [1st Dept 2022]).
Accordingly, the order of Family Court, New York County (Yael T. Wilkofsky, J.), entered on or about October 9, 2024, which vacated an order of the same court (Anna R. Lewis, J.), entered on or about January 3, 2024, which placed nonrespondent mother K.K. under ACS supervision during the pendency of the neglect proceedings against respondent father A.R., on consent of ACS, should be affirmed on the grounds stated above, without costs.
Order, Family Court, New York County (Yael T. Wilkofsky, J.), entered on or about October 9, 2024, which vacated an order of the same court (Anna R. Lewis, J.), entered
on or about January 3, 2024, affirmed, without costs.
Opinion by Gesmer, J. All concur. ,[*9]
Kennedy, J.P., Friedman, Gesmer, Scarpulla, JJ. M-1247 — Matter of A.R.
Motion for leave to file an amici curiae brief, granted. M-1268 — Matter of A.R.
Motion for leave to file an amici curiae brief, granted. M-1483 — Matter of A.R.
Motion for leave to file an amicus curiae brief, granted.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 24, 2025

Footnotes

Footnote 1: A "nonrespondent" parent is a parent who is not the subject of a claim of neglect or abuse in a Family Court child neglect or abuse proceeding.

Footnote 2: This is consistent with Sanctuary for Families' observation that home inspections can be deeply upsetting for children, as children can be expected to remove as much clothing, including underwear, as the worker deems necessary, and to allow total strangers to examine their bodies (Amicus Br. of Sanctuary for Families at 21 [citing Hum. Rts. Watch, "If I Wasn't Poor, I Wouldn't Be Unfit": The Family Separation Crisis in the US Child Welfare System [Nov. 2022], available at: https://www.hrw.org/report/2022/11/17/if-i-wasnt-poor-i-wouldnt-be-unfit/family-separation-crisis-us-child-welfare [last accessed Apr. 15, 2025]).

Footnote 3: We are not faulting the individual caseworkers who had no choice but to implement ACS's illegal policy.

Footnote 4: See also Amicus Brief of Sanctuary for Families at 17, citing Colleen Henry & Vicki Lens, Marginalizing Mothers: Child Maltreatment Registries, Statutory Schemes, and Reduced Opportunities for Employment, 24 CUNY L. Rev. 1, 14-15 (2021); Abigail Kramer, New Sch., Ctr. for N.Y.C. Affs., Banned for 28 Years: How Child Welfare Accusations Keep Women out of the Workforce 1 (Feb. 2019), available at: https://www.centernyc.org/banned-for-28-years (last accessed Apr. 23, 2025); Hum. Rts. Watch, "If I Wasn't Poor, I Wouldn't Be Unfit": The Family Separation Crisis in the US Child Welfare System 48 (Nov. 2022), available at: https://www.hrw.org/sites/default/files/media_2022/11/us_crd1122web_3.pdf (last accessed Apr. 23, 2025).